Thank you, Your Honors. Good morning, Your Honors. Good morning, Cases Court. My name is Monica Sears-DeVos, and I represent the Chinese Center in Boston, Wisconsin. I would like to serve today to decide for you all how each of these cases will be resolved, and I'll tell you whether or not this court's plan is going to be a nice start on establishing a patient-case family that serves the interests of clinical evidence. I'll give you the facts that I presented in the hearing, and I will be in relation to our NBIA to take time to weigh the testimony of the patients about the wrong decisions you've heard and to the practitioners of this finding. As you can see from the resident transcript of a series of uneducated, unsophisticated individuals, she was quote-unquote found in the United States in 2010 but stopped for a year or two, but did not get stopped anywhere near her home country. The resident is now clear as to what I just told, how an unsophisticated individual should accept her accommodation. It is the interview by the host patient and the questions asked that are in this case and in several other cases. You should be turning to me if you've never asked such a question, but either one of the other patients, whether she was quote-unquote born in the United States or rather whether she came from where she came from. Let me give you the evidence before we continue and then I'll be done. In 2013, she was prepared and conjectured with U.S. Citizenship Act territory. However, during the hearing, it was discovered that in 2013 she was brought to Paris. Thus, there was no way to keep control of what was given to her by the immigration judge. Both agents were left with testimony of the petitioner and the agents. Both agents testified at the hearing that neither one had any independent records on the origin of the petitioner. In fact, both admitted that they relied upon and reused the testimony in 2013 prior to the testimony. Further, neither contained the absolute certainty that they specifically asked the petitioner where she was born. In fact, agents never indicated in this testimony that a large part of the information that he told in 2013 came from the immigration container launched by the agents themselves. And here we know that in 2013, he gained numerous errors in giving the information because of a poor publication. What we can say is that both agents did agree that the petitioner did not indicate his position to the agency. The petitioner, on the other hand, was quite clear that he was never asked the specific question of where was he born. He didn't even ask that question. He stated that he believed he would not disclose that he didn't know where she was born and her name in the story. Well, I'm going to ask you, let's assume that we don't consider what you've noticed when we conclude that the agents did ask you a question where you told them you said Mexico, which is still a very disparate region. Do you want me, through the analysis, to do this in my own words, or is there still a better way for you to bring it up? Well, there's no doubt that he thought that best. He was alone. And there's no doubt evidence would not be sufficient to prove what sort of evidence that he was, in fact, a Mexican national. So, in terms of the burden to the respondent or to the persuasion of that, I believe that all of your testimony indicated how he did not even know the foundations, the base of say that came from it. So, I think that we should decide when we're going to find further additional evidence and that's why I believe that we should assume that most of the time, there's been suspicions, but all evidence provided by Mr. Alexander that proves the evidence that they don't want to have that diverted and that's how they're standing. Well, he tells the body, the dictator, he provides that testimony that the agents used by Alexander is not going to be the key towards the results. The testimony provided at the hearing that he gave to his contacts with the Mexican consulate to determine if there were birth certificates of the author under the name of Roger Alexander. And the consulate also interviewed him to find more evidence by Roger Alexander of that name. He does not have any parental information. He does not provide any parental information. We provided evidence that we worked towards that team such as bringing tanks for the children. There was a DNA analysis presented on tactical ethnicity. There were, you know, the FBI had started their process of DNA analysis to see if this was a missing child. This is a missing child. We are a press house. We provide a lot of evidence. This is basically evidence. There's no evidence. But we started with the proposition that the agents must be quotiently submitted and not be pseudosubmitted. And this is a rebuttal. I will leave you with a story that the jury believes that the contents may have been false. But it's a solid building. Yes. We did not consider what the authors' responses to this case. This is the most evidence-based that we've ever seen in any context. And we knew where we were born. I'm not calling for the fact that you just have a void of information or a surplus of information. It seems to check out and you can't get rid of it. The DNA registry is fingerprints. It doesn't match. There's a reason why it's called like this. And it doesn't match. There's just nothing we know about this person. In the end, at 12 o'clock, he's reported to have said that he wanted these to not be seen. Does that make your understanding of the state of affairs? Yes, Your Honor. I would also submit that it's similar to the case that we're interested in finding at 5-5-9-3 in 1995, where the court found that a jury was misdirected where there's a lot of injury and a lot of evidence. And when the time comes, the government is going to establish that there's more evidence, more evidence, more evidence, more evidence available. So, counsel, what would you like to hear from the jury? Well, I'll just... What would you ask the jury? We're asking the court to find if there is, in fact, a material issue in the DNA registry. Okay. Let me send you this report and put that in your... in this report. I understand. I'm here. I have a response for you. What... What happens next? Do you need answers from the jury judge or can you send them to me? The district courts have made a finding that my client, the petitioner in your case, falls within the national statute and that will be addressed in U.S.C. 1401, where it refers to the family statute for a person of unknown heritage and up in the U.S. once at the age of five until shelf prior to the age of teenage 41. So, I'll send it to the court in the United States. I know that there are some needs required to have a statute, but we would submit to the court that he was not necessarily consented to an immigration. But he was found in a country by his own testimony prior to that age and he was living in a family of jobs in the U.S. who believed he belonged in a country other than in the United States. Just for reference, we have stopped you over two minutes so you can continue with your remodeling. Please ask your question. So, you can't see the phone, so I think you should have asked that question. I'm sorry, I'm hearing a big call in the back. Apologies. It's coming from the online and it's a screen. Let's hear from the three people who are on the screen. So, you have a question about the United States immigration. Yes, I have a question. You have a question. Yes, I have a question.  Yes, I have a question. Yes, I have a question. Okay.
judges: Clifton, Watford, Melloy